CESA CARTAGE, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; ARRIANO CESA AND ASSUNTA CESA, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cesa Cartage, Inc. v. Commissioner
Docket Nos. 16003-85; 16004-85
United States Tax Court
T.C. Memo 1989-76; 1989 Tax Ct. Memo LEXIS 80; 56 T.C.M. (CCH) 1311; T.C.M. (RIA) 89076; February 27, 1989
Donald J. O'Connor, for the petitioners. James V. Moroney, for the respondent. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: Respondent determined the following deficiencies and additions to tax against the various petitioners: Cesa Cartage, Inc.
Additions to Tax
Taxable Year Ending
Deficiency
Sec. 6653 (b) [1]
December 31, 1976
$ 3,027.00
$ 1,514.00
December 31, 1977
3,212.00
1,606.00
Arriano and Assunta Cesa
Additions to Tax
Year
Deficiency
Sec. 6653 (b) [2]
1976
$ 5,402.11
$ 2,701.06
1977
6,864.00
3,432.00
1978
6,872.64
3,436.32
Respondent asserts that there are several issues *82 for our decision. However, the primary question to answer is whether any part of either petitioner's determined deficiencies are attributable to fraud. If no part of the deficiencies are due to fraud then the statute of limitations bars the assessment of tax for any of these years. Section 6501(a). Conversely, if fraud is found in any year, the statute of limitations is still open for that year. Section 6501(c). Our analysis of whether or not fraud exists will focus primarily on three issues -- (1) Expense checks written by Cesa Cartage, Inc. to Arriano Cesa (Mr. Cesa); (2) The 1976 and 1977 corporate checks received from two trucking companies which were recorded on corporate books for amounts less then the actual amount of payment, with corresponding entries recording the unreported amounts as shareholder loans from Mr. Cesa to Cesa Cartage; and (3) The failure to report on the corporate return gross receipts deposited into the freight payment plan and the diversion of three $ 2,000 checks from the corporation's general checking account to Mr. Cesa's personal use. Assuming we do find fraud in this case, we will also address respondent's specific determinations that *83 Arriano and Assunta Cesa failed to report income received in 1976, 1977 and 1978; that Cesa Cartage understated its gross receipts in 1976 and 1977; that Cesa Cartage is not entitled to deductions made on behalf of Mr. Cesa in 1976, 1977 and 1978; [3] and other adjustments in the notice of deficiency. Finally, respondent has also determined that since Cesa Cartage was not incorporated until June 2, 1976, Mr. Cesa must therefore include all business transactions of Cesa Cartage Company between Februry 16, 1976 and June 2, 1976 as part of his personal tax return. *84 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulated facts and attached exhibits are incorporated into our findings by this reference. These consolidated cases involve a corporation, Cesa Cartage, Inc. (and its predecessor, Cesa Cartage Company) and individual taxpayers Arriano and Assunta Cesa. Arriano and Assunta Cesa lived in South Euclid, Ohio when they timely filed their petition in this case. Assunta Cesa has passed away since the Cesas filed their petition. [4]
Cesa Cartage Company began operations on February 16, 1976, and operated as a sole proprietorship until June 2, 1976. During that time Cesa Cartage *85 Company had gross receipts of $ 75,598 and business expenses of $ 68,941.36. On June 2, 1976 Cesa Cartage, Inc. (Cesa Cartage) filed its Articles of Incorporation with Ohio's Secretary of State. Cesa Cartage is an Ohio corporation with its principal place of business in Cleveland, Ohio, and Mr. Cesa is its sole shareholder. [5]
Cesa Cartage is a trucking business. Mr. Cesa, who came out of retirement in order to operate Cesa Cartage, started business operations when given the opportunity to purchase Schultz Trucking Co. in 1976 for $ 1,000. Shultz Trucking was forced out of business due to its own tax problems. In 1974 the Cesas reported $ 1,020 in gross income and in 1975 they reported $ 0. In February 1976 when Mr. Cesa bought the assets of Shultz Trucking Co. he had approximately $ 400 cash on hand. When Cesa Cartage was incorporated, 300 shares of common stock were authorized and issued. Originally 200 shares were issued to Mr. Cesa, 50 shares to Mrs. Cesa and 50 shares to their son Raymond. However, in 1977, Raymond transferred his 50 shares to his father without consideration. Mr. Cesa hired Frank Piraino *86 (Piraino) as accountant and bookkeeper for Cesa Cartage when he started the business. Piraino prepared both Cesa Cartage's corporate tax returns and Mr. and Mrs. Cesa's individual tax returns in 1976 and 1977. In 1979 Mr. Cesa hired the certified public accounting firm of Monastra, Cuani & Panichi for personal and corporate tax matters. Mr. D'Amore, an employee of the CPA firm, prepared the Cesas' 1978 tax return, their 1978 amended return, and the 1978 corporate return for Cesa Cartage. Mr. Cesa drew a salary of $ 400 at Cesa Cartage beginning February 27, 1976. Mr. Cesa stopped his salary draw on April 9, 1976, and did not begin taking salary checks again until October 20, 1976. Mr. Cesa's salary in October 1976 was $ 300 per week. Mr. Cesa's salary increased after January 12, 1978 to $ 400 per week. His salary increased once more to $ 500 per week on October 31, 1978. He received three salary checks on that date. The checks continued weekly thereafter through year end. All of the salary checks that Mr. Cesa received were charged to account 512, Payroll-Officers. Piraino included all checks charged to account 512 in the Cesas' income tax returns for 1976 and 1977. Similarly, *87 D'Amore included all amounts charged to account 512 on the Cesas' tax return for 1978. Cesa Cartage's general checking account was opened at Euclid National Bank (formerly the Continental Bank). The same account was used for Cesa Cartage Company (February 16, 1976 through June 2, 1976) and Cesa Cartage, Inc. (June 2, 1976 and thereafter). In May 1977, a "freight payment plan" (FPP) account was opened at Cleveland Trust Company (now Ameritrust). Certain of Cesa Cartage's customers were also participants in the FPP. Under the functioning of the FPP Cesa Cartage was able to send invoices for trucking services to Cleveland Trust. After the participant customer checked the invoice, Cleveland Trust Company would debit the participant customer's account and deposit the funds into Cesa Cartage's FPP account. The only way to withdraw funds from the FPP was to use a preprinted check made payable to Cesa Cartage, Inc.
Expense Checks
During his time with the company Mr. Cesa was "reimbursed" for many business expenses. The "reimbursement" or "expense" checks started on March 2, 1976 in the amount of $ 200. In April 1976 when Mr. Cesa's salary checks stopped he was given "expense" *88 checks of approximately $ 400 per week on average. Between April and October when he was not receiving salary checks the amount Mr. Cesa received in one week sometimes rose to $ 800 or $ 1,000. Cesa Cartage reimbursed Mr. Cesa for expenses he listed on petty cash summary sheets and also gave him "expense" checks when there were no petty cash summary sheets supporting the payments. All of the checks were payable either to Mr. Cesa, to "cash" or to "petty cash." Not all of the expenses on the petty cash summary sheets were obvious business related expenses and often included expenses for liquor, gifts, lodging, and meals and entertainment with or without a receipt. The expenses from the summary sheets were charged to various Cesa Cartage accounts. For a list of all the checks Mr. Cesa received between March 2, 1976 and December 31, 1978 see Appendix A. The following chart sets forth the total amount of non-salary "expense" checks Mr. Cesa received during the years in issue, as established at trial, and respondent's determination of slightly different amounts in his notice of deficiency: Year
At Trial
Per Respondent
1976 (pre-incorporation)
$  5,598.44
$  5,698.44
1976 (post-incorporation)
14,834.38
14,834.38
1977
[6] 22,784.73
[7] 25,940.29
1978
20,824.98
20,225.00
*89 Mr. Cesa's non-salary income is properly offset by his actual outlay of business-related petty cash. Respondent did not allow any offset for the expenditures listed on petty cash summary sheets if there was evidence Cesa Cartage paid the expense directly. Respondent did, however, permit Mr. Cesa to offset the non-salary income in many instances when there were no receipts supporting the expense. The expenses shown on the petty cash summary sheets and allowed by respondent are as follows: Year
At Trial
Per Respondent
1976 (pre-incorporation)
$ 2,189.56
$    789.44
1976 (post-incorporation)
3,289.41
3,289.29
1977
8,968.33
10,069.65
1978
-0-  -0-  *90 Mr. Cesa is not entitled to be reimbursed for expenses he did not actually make. For example, Cesa Cartage company paid $ 1,025 directly to Sky Oil Co. in the early part of 1976; nevertheless the charges were incorporated in the summary sheets. Besides the summary vouchers, there are no receipts substantiating that the remaining payments to Mr. Cesa were business related. Respondent's determination is more generous for all the years in issue than we would have allowed based on the evidence presented at trial. Therefore we accept respondent's figures relating to allowable expenses. Respondent held several audit interviews prior to issuing the notice of deficiency in this case. Mr. Cesa was generally very cooperative and forthcoming at all of the audit meetings. At one of those audit meetings Mr. Cesa admitted that some of Cesa Cartage's "business" expenditures which were charged to miscellaneous and repair accounts should have been classified as salary and wages, and that there were personal and living expenses deducted as business expenses on the corporate returns. Recording Discrepancies
In 1976 and 1977 Cesa Cartage did business with Schipper's Express, Inc. *91 (Schipper's). On three separate occasions Cesa Cartage invoiced Schipper's for services performed. The first invoice was issued on November 22, 1976 for $ 1,207.36. Schipper's paid Cesa Cartage by check on November 24, 1976 which was deposited on December 3, 1976. Cesa Cartage recorded the check as $ 207.36 in the cash receipts journal. Cesa Cartage sent the second invoice on December 1, 1976 for $ 1,581.27. Schipper's paid Cesa Cartage the next day and Mr. Cesa deposited the check on December 3, 1976. The check was recorded as $ 581.27 in the cash receipts journal. Cesa Cartage issued the final invoice for $ 1,251.78 on December 9, 1976. Schipper's paid Cesa Cartage on December 16, 1976. The check was recorded as $ 251.78 in the cash receipts journal. Cesa Cartage also did business with Bowman Transportation Co., Inc. (Bowman). On two occasions in 1976 Cesa Cartage recorded a sum less than the face amount of the check as payment in the cash receipts journal. In the first instance Cesa Cartage sent an invoice to Bowman for $ 4,360.40 on November 23, 1976. The check for payment was deposited on December 3, 1976 and was recorded as $ 2,360.40 in the cash receipts journal. *92 In the second instance Cesa Cartage issued an invoice to Bowman on December 13, 1976 for $ 3,819.76. Cesa Cartage deposited the payment check and recorded the payment as $ 2,319.76 in the cash receipts journal. These five payments to Cesa Cartage totalled $ 12,220.57 and were corporate gross receipts received in 1976. The full amounts were deposited into the Cesa Cartage bank account. The cash receipts journal evidenced payments of $ 5,720.57. The remaining $ 6,500.00 was credited to Account 209, Notes Payable -- Arriano D. Cesa. A similar situation arose in 1977 involving Bowman. On December 19, 1977 Cesa Cartage issued an invoice to Bowman for $ 6,763.07 for services performed. Bowman paid Cesa on December 22, 1977 and the check was deposited into Cesa Cartage's account on December 30, 1977. Cesa Cartage recorded the payment as $ 4,263.07 in the cash receipts journal. The remaining $ 2,500 was credited to Account 209 Notes Payable -- Arriano D. Cesa. The corporate tax returns for 1976 and 1977 did not reflect the $ 6,500 in 1976 or the $ 2,500 in 1977 credited to Mr. Cesa's notes payable accounts among its gross receipts. Mr. Cesa has discussed the notes payable *93 account with respondent's representatives on two occasions. One time he told Agent Caja that the notes payable/shareholder loan account was Piraino's idea. At another time Mr. Cesa said the shareholder loan account was a "joint suggestion" of himself and Piraino. Mr. Cesa also admitted to Agent Caja that he had not loaned Cesa Cartage $ 8,000 in 1976 nor had he loaned the company $ 2,500 in 1977. At that meeting Mr. Cesa also admitted to Agent Caja that the amounts credited to his shareholder loan account were diverted from the corporation's receipts in order to reduce corporate taxes. Freight Payment Plan
Cesa Cartage opened its FPP account with the Cleveland Trust Company in 1977. Cesa Cartage's other checking account was with Euclid National Bank. Since Cesa Cartage was under audit, Agent Caja asked Mr. Cesa for all of Cesa Cartage's income records before their initial audit meeting on June 30, 1978. Initially, Mr. Cesa only produced information relating to the regular checking account at Euclid National Bank. In 1977, $ 6,425.73 was deposited into the freight payment plan account. The deposits were gross receipts to Cesa Cartage but were not included in its corporate *94 tax return for 1977. In fact, the FPP first appeared in Cesa Cartage's general ledger on November 30, 1978. The only means of withdrawing funds from the FPP was through a pre-printed check payable to Cesa Cartage, Inc. In 1977, three $ 2,000 checks were drawn on the FPP and deposited into the Euclid National Bank checking account. In return, three corresponding $ 2,000 checks were drawn on the Euclid National Bank Checking account payable to Arriano Cesa. Mr. Cesa deposited two of the three checks into his personal account at Euclid National Bank. The other check was apparently cashed. Mr. Cesa did not report the $ 6,000 as income on his 1977 income tax return. At an audit meeting held July 13, 1978 Agent Caja asked Mr. Cesa about 38 missing invoices and the source of three $ 2,000 checks deposited into the Euclid National Bank checking account. Mr. Cesa claimed he could not remember the source of the checks or the location of the 38 invoices. On July 14, 1978 Mr. Cesa, his attorney and Agent Caja held another audit meeting. Agent Caja agains asked about the source of the three checks and the missing invoices. Mr. Cesa produced the invoices and other information relating *95 to the FPP account. This was the first time Mr. Cesa disclosed the FPP account. Either Mr. Cesa or Piraino voided the check stubs of the $ 2,000 payments from Cesa Cartage to Mr. Cesa. In addition, Piraino revised and lowered the deposit figures on the bank reconciliation form for the Euclid National Bank checking account for August, October and December, 1977 -- the three months the checks were drawn for Mr. Cesa. Mr. Cesa claims to have repaid most of the $ 6,000 he received from the FPP during 1977 in 1978. On February 1, 1978 Mr. Cesa paid Cesa Cartage, Inc. $ 5,000. There is no evidence that the Notes Payable -- Arriano D. Cesa account was reduced either after he paid the $ 5,000 or at any other time. Other Indicia of Fraud
During one of the audit meetings Mr. Cesa admitted that he met with Piraino in November or December each year to determine how much money he had made during the year. After making the determination he set up a reserve account to cover any amounts which might be discovered on audit. The reserve held approximately $ 11,000. Mr. Cesa then stated he only hoped to stay out of jail. Roy R. Walker, Donald J. Panian, Raymond J. Cesa and Richard *96 Cesa were employees of Cesa during 1976 and 1977. At various times these men received checks from Cesa Cartage in addition to their salary checks. Cesa Cartage did not withhold income tax or FICA on these additional amounts. All four employees were audited for the 1976, 1977 and 1978 taxable years. All four of these employees, after filing cases in the Tax Court, reached a settlement with the Internal Revenue Service. Under the terms of the settlement the employees all agreed to recognize previously unreported income, conceded that they had not paid any business expenses for the company in any of the years and admitted their liability for additions to tax due to fraud in 1976 and 1977 as well as additions to tax for negligence in 1978. OPINION As a preliminary matter, petitioners have objected to the relevancy and materiality of the facts relating to the tax cases of the other Cesa Cartage employees. To the extent specified the Federal Rules of Evidence apply to Tax Court trials. Section 7453; Rule 143(a). Rule 401 of the Federal Rules of Evidence defines relevant evidence as "evidence *97 having any tendency to make existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" (Emphasis added.) Thus, not every piece of evidence needs to absolutely prove a particular point at trial, but relevant evidence helps build the proof on matters at issue. The legitimacy of expense checks paid to Mr. Cesa is at issue in the cases at bar. The fact that other employees received additional corporate checks and had not paid any of the company's business expenses does not prove that Mr. Cesa also received fictitious reimbursement checks. However, the fact that Cesa Cartage was involved in a fictitious check scheme with four employees is relevant to a determination of whether Cesa Cartage was involved in a fictitious check scheme with Mr. Cesa. Fraud
Respondent has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). To meet this burden respondent must show petitioner intended to evade taxes known to be owing by conduct intended to conceal, mislead, or *98 otherwise prevent the collection of taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983). Respondent must prove fraud for each year he determines the addition to tax under section 6653(b). Shaw v. Commissioner,27 T.C. 561 (1956), affd. 252 F.2d 681 (6th Cir. 1958). We consider the entire record to determine whether fraud exists. Estate of Pittard v. Commissioner,69 T.C. 391, 400 (1977); Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. 578 F.2d 1383 (8th Cir. 1978); Stratton v. Commissioner,54 T.C. 255, 284 (1970). Fraud is not imputed or presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970). Respondent may, however, prove fraud through circumstantial evidence since direct evidence of the taxpayer's intent is rarely available. Spies v. United States,317 U.S. 492 (1943); Rowlee v. Commissioner, supra at 1123. Respondent cannot rely on petitioner's failure to prove error in respondent's determination of the *99 underlying deficiency to meet his burden of proving fraud. Habersham-Bey v. Commissioner,78 T.C. 304, 312 (1982); Otsuki v. Commissioner,53 T.C. 96, 106 (1969); Pigman v. Commissioner,31 T.C. 356, 370 (1958). In these cases, a corporation is also one of the petitioners. A corporation is a separate entity created by statute. Since the corporation is an artificial entity, it acts through its officers, employees and agents. Ace Tool & Engineering Inc. v. Commissioner,22 T.C. 833, 843 (1954); Federbush v. Commissioner,34 T.C. 740 (1960), affd. 325 F.2d 1 (2d Cir. 1963). The wrongful acts and intentions of the corporation's representatives can be imputed to the corporation. Federbush v. Commissioner, supra;Auerbach Shoe Co. v. Commissioner,21 T.C. 191 (1953), affd. 216 F.2d 693 (1st Cir. 1954). Thus, if the corporation is the agent's alter ego, or if the agent is acting on behalf of the corporation such that the corporate entity actually *100 benefits from the fraudulent acts, corporate fraud exists. Ruidoso Racing Assn. v. Commissioner,476 F.2d 502 (10th Cir. 1973). In this case respondent must prove fraud against both Cesa Cartage and Mr. Cesa. Respondent has met his burden in both instances. Mr. Cesa is currently the sole shareholder of Cesa Cartage. During the years in issue he was the majority shareholder and his wife was the other shareholder. Mr. Cesa also ran Cesa Cartage in the operational sense of the word. Piraino, as bookkeeper, assisted Mr. Cesa. Mr. Cesa's admissions during his several audits establish that he knew he was receiving income which he neglected to report and that the corporation was erroneously deducting payments to him as business expenses. Specifically Mr. Cesa admitted that certain salary and wage payments were misclassified as other expenses, that personal living expenses were paid by Cesa Cartage and deducted as business expenses, that shareholder loan accounts were used to divert corporate gross receipts to him in order to evade corporate taxes, that he had taken $ 6,000 from the freight payment plan account and that he had created a reserve account to pay for *101 any potential liabilities resulting from these actions and he hoped to avoid jail. The transactions themselves, even without Mr. Cesa's admissions, also evidence civil tax fraud. Mr. Cesa had a legitimate petty cash system operating at Cesa Cartage. At the same time, he received thousands of dollars in "expense" checks and provided no documentation to support the "expenses." Mr. Cesa stopped drawing a salary for seven months in 1976. The evidence indicates that Mr. Cesa did not have the personal resources to support himself and his wife for seven months without a salary. In 1974 the Cesa's reported $ 1,020 in gross income and in 1975 they reported zero in gross income. Moreover, Mr. Cesa had only approximately $ 400 in cash on hand at the beginning of 1976. We find that a portion of the expense checks were personally used by Mr. Cesa. The fictitious expense check scheme was ongoing in 1976, 1977 and 1978. We also find that Mr. Cesa either conceived of or knew about the discrepancies in recording sales to Schipper's and Bowman. The recording errors resulted in unreported income to Cesa Cartage of $ 6,500 in 1976 and $ 2,500 in 1977. These amounts correspondingly increased *102 the amounts of the "shareholder loans" due to Mr. Cesa. We also find that Mr. Cesa was aware that the $ 6,000 he received in the form of three $ 2,000 payments originated from the FPP account and that the amount was not recorded as income in 1977 either to Cesa Cartage or Mr. Cesa. Mr. Cesa asserts that he is innocent of fraud and that it was Piraino who was guilty. Mr. Cesa claims that he mistakenly trusted and relied on Piraino but that his actions do not amount to fraud. We give little weight to Piraino's affidavit, submitted by respondent and which incriminates Mr. Cesa, and find that Piraino participated in the fraud perpetrated on the Government. We also, however, give little weight to Mr. Cesa's assertion. We will not ignore the economic facts of this case. Mr. Cesa received "reimbursement" or "expense" checks almost every week. He had petty cash vouchers for only a small portion of those checks. The checks which were not supported by petty cash vouchers were usually for sums in round numbers for hundreds of dollars, i.e., $ 200, $ 300, $ 400 etc. Also, the amount of the reimbursements or "expense" checks increased during the period Mr. Cesa was not drawing a salary. *103 Finally, even if the miscategorizing of income was Piraino's idea rather than Mr. Cesa's, we do not believe Mr. Cesa could have received weekly checks, used them for his personal needs and then unwittingly forgotten or neglected to report the sums as income. During all of 1976 Mr. Cesa received close to $ 20,000 in non-salary checks. He received over $ 21,000 in non-salary checks in 1977 and over $ 19,000 in non-salary checks in 1978. Even if we assumed that all the petty cash vouchers evidenced legitimate business expenses (which we do not), Mr. Cesa still received in excess of $ 16,000 in non-salary checks in 1976, over $ 12,000 in non-salary checks in 1977 and over $ 19,000 in non-salary checks in 1978. Considering the amount of Mr. and Mrs. Cesa's declared income for those years, we do not believe such significant sums could be easily overlooked. Moreover, these amounts do not include the three $ 2,000 checks which were taken from the freight payment plan account, deposited in Cesa Cartage's account and withdrawn for Mr. Cesa's benefit. It is clear that Mr. Cesa is guilty of civil tax fraud for all the years before us. Cesa Cartage is also guilty of fraud for 1976 and *104 1977. Mr. Cesa was the majority shareholder of Cesa Cartage in 1976 and 1977. During that time he controlled the corporation. His fraudulent actions resulted both in an understatement of his personal income and an understatement of the corporation's income. Under the facts of this case Mr. Cesa's fraudulent actions may be imputed to Cesa Cartage. American Lithofold Corp. v. Commissioner,55 T.C. 904 (1971). Federbush v. Commissioner,34 T.C. 740 (1960), affd. on other issues 325 F.2d 1 (2d Cir. 1963). Since we have found fraud against Mr. Cesa for 1976, 1977 and 1978 and against Cesa Cartage for 1976 and 1977, the statute of limitations does not bar the assessment of tax. Section 6501(c). Unreported Income
Respondent determined that a portion of the Cesas' deficiencies during the years at issue was due to their failure to report other income received from Cesa Cartage. In support of his position respondent has submitted evidence of hundreds of cancelled checks payable either to Mr. Cesa, to "cash" or to "petty cash." Mr. Cesa negotiated all of these checks. At all times Mr. Cesa has claimed that these checks were paid *105 to reimburse him for business expenses he had paid. It is clear that the amounts that Mr. Cesa received which did not reimburse business expenses are income. As we said in A & F Management Corp. v. Commissioner,T.C. Memo. 1984-585: Payment of corporate funds to a shareholder of the corporation will result in additional income to the shareholder where the shareholder "received money over which he had complete control and which he took as his own, treated as his own, and which resulted in economic value to him." Weir v. Commissioner,283 F.2d 675, 684-685 (6th Cir. 1960). Moreover, expenditures made by a corporation for the personal benefit of its shareholders may result in the receipt of income by the shareholders. Cirelli v. Commissioner,82 T.C. 335, 351 (1984). * * * [49 T.C.M. 16, 20; 53 P-H Memo. T.C. par. 84,585, at 2361.] We also made an inventory of the checks Mr. Cesa received from Cesa Cartage to reimburse expenses and the petty cash summary sheets. Clearly, Mr. Cesa has not substantiated that *106 an amount greater than that allowed by respondent was to reimburse him for business expenses -- a matter on which he bears the burden of proof. Rule 142(a). However, we are unable to reconcile with respondent's determination the amounts we have determined Mr. and Mrs. Cesa received from Cesa Cartage and failed to report. We do, however, accept respondent's determination as to the allowable deduction for actual reimbursement since it exceeds that which we would allow based upon the evidence presented at trial. We have determined that in 1976 Mr. Cesa received $ 20,432.73 in expense checks and in 1977 he received $ 22,784.73. Our determination is supported by cancelled checks in evidence plus nine other checks recorded in the cash disbursement journal as payable either to Mr. or Mrs. Cesa and not charged to the payroll account. Respondent includes an additional $ 4,192 in his determination which he claims was paid to or on behalf of the Cesas. Respondent directs us to the cash disbursements ledger in support of his position. However, the ledger does not support respondent's contention. We thus do not include the additional $ 4,192 in Mr. Cesa's income. In addition to the amounts *107 Mr. Cesa received in "expense checks," we have determined that he also received $ 6,000 from the FPP account which he failed to report in 1977. Our determination of unreported income for 1978 exceeds respondent's determination. Under the circumstances, we will limit the amount of Mr. Cesa's unreported income for 1978 to the amount respondent determined. This case is appealable to the United States Court of Appeals for the Sixth Circuit. We follow the precedent within that circuit. Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971). In the Sixth Circuit it is unnecessary to characterize the amounts of additional income as dividends, capital gains, return of capital, wages or compensation. Weir v. Commissioner,283 F.2d 675 (6th Cir. 1960); Benes v. United States,276 F.2d 99 (6th Cir. 1960); Davis v. United States,226 F.2d 331 (6th Cir. 1955); E.J. Benes & Co. v. Commissioner,42 T.C. 358 (1964), affd. 355 F.2d 929 (6th Cir. 1966). [8]
*108 Mr. Cesa failed to include income on his tax returns in 1976, 1977 and 1978. We deduct the expenses respondent allowed from the amount of income we have determined Mr. Cesa failed to report, to come up with the net unreported income for each of the years in question. Accordingly, Mr. Cesa has $ 16,345.09 in unreported income for 1976 (20,432.82 - 4,087.73); he has $ 18,715.08 in 1977 [(21,448.73 + 1,336 + 6,000) - 10,069.65]; and he has $ 20,225.00 in unreported income in 1978. In a corresponding adjustment, respondent has determined that deductions for Cesa Cartage should be disallowed in the amounts of $ 16,445 in 1976, $ 15,871 for 1977 and $ 20,225 in 1978. In light of the differences between our determination and respondent's determination of Mr. Cesa's unreported income, we find that Cesa Cartage's disallowance is limited to $ 16,345.09 and $ 12,715.08 respectively for 1976 and 1977. These figures represent the amount Mr. Cesa must include in his income, but the figure for 1977 is adjusted to reflect the fact that Cesa Cartage apparently did not deduct the $ 6,000 which was diverted from the FPP account to Mr. Cesa. We agree with respondent's determination for the *109 1978 taxable year to the extent that determination affects Cesa Cartage's 1976 and 1977 taxable years. Cesa Cartage has not presented any evidence to support business expense deductions in excess of those allowed by respondent. Other Adjustments
Petitioners bear the burden of proof on all of the other adjustments in the notice of deficiency, most of which they never addressed. Included in the adjustments is a determination of unreported income by Cesa Cartage in 1976 and 1977. Since petitioners have never offered any proof that the "other adjustments" from the notice of deficiency are incorrect, they have failed to meet their burden of proof and we find for respondent on those adjustments. [9]
Additionally, respondent presented evidence at trial which supported his determination that the corporate petitioner, Cesa Cartage, understated its income in 1976 and 1977. Although he does not bear the burden of proof, respondent has *110 shown that the amounts credited to Mr. Cesa's loan account in 1976 and 1977 were not loans, but were instead part of the corporation's gross receipts. Respondent has also shown that Cesa Cartage failed to report the amount deposited into the FPP in its corporate income tax return for 1977. As a result, we find for respondent on Cesa Cartage's understatement of income. Cesa Cartage Company Income February 16, 1976 through June 2, 1976
Whether or not an organization is taxed as a corporation is a question of Federal not state law. However, we do look to local law to determine whether the legal relationships have been established so that the Federal standards are met. Section 301.7701-1, Proced. & Admin. Regs. Under Ohio law, a corporation exists upon the filing of the Articles of Incorporation. Ohio Rev. Code Ann. § 1701.04(D) (1985). A de facto corporation exists in Ohio if there is: (1) a charter or law under which a corporation with the powers it wishes to exercise may exist; (2) an *111 attempt to organize as a corporation; (3) colorable compliance with the relevant corporation law; and (4) an actual exercise of corporate powers. Society Perun v. Cleveland,3 N.E. 357 (1885); Fletcher, Cyclopedia of the Law of Private Corporations § 777 (1982). Petitioners have not shown that Cesa Cartage or Mr. Cesa attempted to comply with the state's corporation law, nor have they shown that there was a good faith attempt to organize as a corporation. The evidence establishes only that Cesa Cartage filed Articles of Incorporation on June 2, 1976 and that Cesa Cartage Company conducted business between February 16, 1976 and June 2, 1976. During that time Cesa Cartage Company had $ 75,598 in gross receipts and $ 68,941.36 in business expenses. We find that Cesa Cartage was not a de facto corporation and cannot be taxed as a corporation between February 16, 1976 and June 2, 1976. The result is that Cesa Cartage Company is treated as a sole proprietorship and Mr. Cesa must include its gross receipts on the Cesa's personal tax return for 1976 [10] and is allowed the corresponding business expense deductions. *112 To reflect the foregoing, Decision will be entered under Rule 155.
APPENDIX A The following is a list of the date and amount of each check Mr. Cesa received as a "reimbursement." Pre-Incorporation
Check Date
Payee
Amount
March 2, 1976
Cash
$ 200.00
March 12, 1976
Arriano Cesa
200.00
March 26, 1976
Cash
200.00
April 2, 1976
Arriano Cesa
200.00
April 7, 1976
Arriano Cesa
400.00
April 16, 1976
Arriano Cesa
400.00
April 16, 1976
Cash
200.00
April 23, 1976
Arriano Cesa
400.00
April 23, 1976
Cash
200.00
April 30,1976
Arriano Cesa
400.00
May 7, 1976
Arriano Cesa
400.00
May 7, 1976
Cash
198.44
May 14, 1976
Cash
200.00
May 14, 1976
Arriano Cesa
400.00
May 21, 1976
Arriano Cesa
400.00
May 21, 1976
Cash
600.00
May 27, 1976
Cash
200.00
May 27, 1976
Arriano Cesa
400.00
Post Incorporation
1976
Check Date
Payee
Amount
June 4, 1976
Cash
$ 350.00
June 8, 1976
Arriano Cesa
400.00
June 9, 1976
Cash
222.35
June 11, 1976
Arriano Cesa
400.00
June 16, 1976
Arriano Cesa
400.00
June 17, 1976
Arriano Cesa
150.00
June 24, 1976
Arriano Cesa
100.00
June 25, 1976
Arriano Cesa
400.00
July 2, 1976
Arriano Cesa
107.09
July 9, 1976
Arriano Cesa
800.00
July 16, 1976
Arriano Cesa
178.73
July 19, 1976
Arriano Cesa
800.00
July 26, 1976
Arriano Cesa
200.69
August 3, 1976
Arriano Cesa
100.66
August 6, 1976
Arriano Cesa
800.00
August 12, 1976
Arriano Cesa
200.00
August 20, 1976
Arriano Cesa
800.00
August 23, 1976
Arriano Cesa
116.00
August 27, 1976
Arriano Cesa
400.00
September 3, 1976
Arriano Cesa
500.00
September 8, 1976
Arriano Cesa
140.93
September 16, 1976
Arriano Cesa
500.00
September 16, 1976
Arriano Cesa
162.07
September 24, 1976
Arriano Cesa
1,000.00
September 30, 1976
Arriano Cesa
475.00
October 4, 1976
Arriano Cesa
153.31
October 4, 1976
Arriano Cesa
500.00
October 8, 1976
Arriano Cesa
500.00
October 15, 1976
Cash
143.51
October 18, 1976
Arriano Cesa
120.00
October 20, 1976
Arriano Cesa
200.00
October 22, 1976
Arriano Cesa
200.00
October 26, 1976
Arriano Cesa
200.00
October 29, 1976
Arriano Cesa
200.00
November 5, 1976
Arriano Cesa
200.00
November 5, 1976
Arriano Cesa
150.00
November 11, 1976
Arriano Cesa
200.00
November 19, 1976
Arriano Cesa
200.00
November 24, 1976
Cash
173.16
November 24, 1976
Arriano Cesa
200.00
December 3, 1976
Arriano Cesa
200.00
December 9, 1976
Arriano Cesa
200.00
December 15, 1976
Arriano Cesa
263.52
December 17, 1976
Arriano Cesa
200.00
December 20, 1976
Arriano Cesa
286.39
December 29, 1976
Arriano Cesa
240.97
December 30, 1976
Arriano Cesa
400.00
1977
January 7, 1977
Cash
$ 218.43
January 19, 1977
Arriano Cesa
200.00
January 24, 1977
Petty Cash
241.51
January 28, 1977
Arriano Cesa
200.00
February 4, 1977
Arriano Cesa
200.00
February 4, 1977
Cash
212.53
February 11, 1977
Arriano Cesa
200.00
February 11, 1977
Arriano Cesa
200.00
February 18, 1977
Arriano Cesa
227.76
February 25, 1977
Arriano Cesa
400.00
March 4, 1977
Arriano Cesa
430.98
(Petty Cash)
March 11, 1977
Arriano Cesa
200.00
March 14, 1977
Arriano Cesa
200.45
March 18, 1977
Arriano Cesa
390.42
March 19, 1977
Assunta Cesa
* 100.00
March 25, 1977
Arriano Cesa
200.00
April 1, 1977
Arriano Cesa
200.00
April 8, 1977
Arriano Cesa
233.99
April 8, 1977
Arriano Cesa
200.00
April 13, 1977
Arriano Cesa
400.00
April 22, 1977
Arriano Cesa
400.00
April 25, 1977
Arriano Cesa
400.00
(notation on check)
May 6, 1977
Arriano Cesa
600.00
May 7, 1977
Arriano Cesa
200.00
May 11, 1977
Arriano Cesa
490.80
May 20, 1977
Arriano Cesa
400.00
May 21, 1977
Arriano Cesa
268.27
(Petty Cash)
May 31, 1977
Arriano Cesa
400.00
June 4, 1977
Arriano Cesa
300.00
June 9, 1977
Arriano Cesa
600.00
(Petty Cash)
June 10, 1977
Arriano Cesa
600.00
June 16, 1977
Arriano Cesa
500.00
June 17, 1977
Arriano Cesa
200.00
June 24, 1977
Arriano Cesa
200.00
June 26, 1977
Assunta Cesa
* 100.00
June 30, 1977
Arriano Cesa
200.00
July 8, 1977
Arriano Cesa
200.00
July 14, 1977
Arriano Cesa
200.00
July 14, 1977
Arriano Cesa
361.24
July 22, 1977
Arriano Cesa
200.00
July 22, 1977
Arriano Cesa
500.00
July 29, 1977
Arriano Cesa
200.00
August 5, 1977
Arriano Cesa
200.00
August 5, 1977
Assunta Cesa
* 100.00
August 11, 1977
Arriano Cesa
355.12
(Petty Cash)
August 12, 1977
Arriano Cesa
200.00
August 19, 1977
Arriano Cesa
200.00
August 19, 1977
Arriano Cesa
200.00
August 26, 1977
Arriano Cesa
200.00
August 26, 1977
Arriano Cesa
200.00
(Petty Cash)
August 31, 1977
Arriano Cesa
200.00
September 9, 1977
Arriano Cesa
200.00
September 9, 1977
Arriano Cesa
300.00
(Petty Cash)
September 15, 1977
Arriano Cesa
300.00
(Petty Cash)
September 15, 1977
Arriano Cesa
200.00
September 19, 1977
Arriano Cesa
* 100.00
September 23, 1977
Arriano Cesa
200.00
September 30, 1977
Arriano Cesa
200.00
September 30, 1977
Arriano Cesa
204.97
(Petty Cash)
September 30, 1977
Arriano Cesa
* 200.00
October 7, 1977
Arriano Cesa
200.00
October 7, 1977
Arriano Cesa
250.00
(Petty Cash)
October 10, 1977
Arriano Cesa
600.00
October 14, 1977
Arriano Cesa
200.00
October 14, 1977
Arriano Cesa
250.00
(Petty Cash)
October 21, 1977
Arriano Cesa
200.00
October 26, 1977
Arriano Cesa
323.67
(Petty Cash)
October 28, 1977
Arriano Cesa
200.00
October 31, 1977
Arriano Cesa
200.00
October 31, 1977
Arriano Cesa
* 236.00
November 12, 1977
Arriano Cesa
200.00
November 19, 1977
Arriano Cesa
200.00
November 19, 1977
Arriano Cesa
265.43
(Petty Cash)
November 22, 1977
Arriano Cesa
200.00
November 30, 1977
Arriano Cesa
200.00
December 1, 1977
Arriano Cesa
300.00
(Petty Cash)
December 3, 1977
Arriano Cesa
300.00
December 8, 1977
Arriano Cesa
200.00
December 10, 1977
Arriano Cesa
400.00
(Petty Cash)
December 15, 1977
Arriano Cesa
200.00
December 20, 1977
Arriano Cesa
400.00
December 22, 1977
Arriano Cesa
200.00
December 27, 1977
Arriano Cesa
* 200.00
December 27, 1977
Arriano Cesa
* 423.10
December 31, 1977
Arriano Cesa
* 200.00
1978
January 12, 1978
Arriano Cesa
200.00
January 19, 1978
Arriano Cesa
200.00
January 25, 1978
Petty Cash
626.99
January 27, 1978
Arriano Cesa
200.00
January 31, 1978
Arriano Cesa
200.00
February 7, 1978
Petty Cash
700.00
February 10, 1978
Arriano Cesa
200.00
February 16, 1978
Arriano Cesa
200.00
February 24, 1978
Arriano Cesa
200.00
February 24, 1978
Arriano Cesa
200.00
February 24, 1978
Arriano Cesa
313.53
March 3, 1978
Arriano Cesa
200.00
March 9, 1978
Arriano Cesa
200.00
March 9, 1978
Arriano Cesa
200.00
March 16, 1978
Petty Cash
500.00
March 17, 1978
Arriano Cesa
200.00
March 23, 1978
Arriano Cesa
200.00
March 30, 1978
Arriano Cesa
200.00
March 30, 1978
Petty Cash
800.00
April 4, 1978
Arriano Cesa
200.00
April 14, 1978
Arriano Cesa
200.00
April 14, 1978
Arriano Cesa
1,032.15
April 20, 1978
Arriano Cesa
200.00
May 2, 1978
Arriano Cesa
200.00
May 5, 1978
Arriano Cesa
200.00
May 26, 1978
Arriano Cesa
600.00
May 26, 1978
Arriano Cesa
500.00
May 31, 1978
Arriano Cesa
200.00
June 1, 1978
Arriano Cesa
250.00
June 5, 1978
Petty Cash
288.14
June 9, 1978
Arriano Cesa
200.00
June 15, 1978
Arriano Cesa
200.00
June 21, 1978
Petty Cash
410.73
June 23, 1978
Arriano Cesa
200.00
June 30, 1978
Arriano Cesa
200.00
June 30, 1978
Arriano Cesa
300.00
July 17, 1978
Petty Cash
300.00
July 22, 1978
Petty Cash
303.57
August 2, 1978
Arriano Cesa
200.00
August 3, 1978
Arriano Cesa
200.00
August 4, 1978
Arriano Cesa
200.00
August 5, 1978
Arriano Cesa
200.00
August 7, 1978
Arriano Cesa
200.00
August 11, 1978
Arriano Cesa
200.00
August 17, 1978
Arriano Cesa
200.00
August 24, 1978
Arriano Cesa
200.00
August 25, 1978
Petty Cash
591.55
August 31, 1978
Arriano Cesa
200.00
September 2, 1978
Petty Cash
300.91
September 8, 1978
Arriano Cesa
200.00
September 11, 1978
Petty Cash
210.95
September 14, 1978
Arriano Cesa
200.00
September 21, 1978
Arriano Cesa
200.00
September 29, 1978
Arriano Cesa
200.00
September 30, 1978
Petty Cash
303.92
October 3, 1978
Arriano Cesa
200.00
October 12, 1978
Arriano Cesa
200.00
October 17, 1978
Petty Cash
431.60
October 26, 1978
Arriano Cesa
400.00
October 26, 1978
Arriano Cesa
100.00
November 3, 1978
Arriano Cesa
200.00
November 10, 1978
Arriano Cesa
200.00
November 13, 1978
Petty Cash
300.85
November 16, 1978
Arriano Cesa
200.00
November 16, 1978
Arriano Cesa
200.00
November 16, 1978
Arriano Cesa/
462.86
Petty Cash
November 22, 1978
Arriano Cesa
200.00
November 30, 1978
Arriano Cesa
200.00
December 4, 1978
Petty Cash
300.00
December 6, 1978
Arriano Cesa
200.00
December 14, 1978
Arriano Cesa
200.00
December 20, 1978
Arriano Cesa
200.00
December 22, 1978
Petty Cash
497.23
December 26, 1978
Arriano Cesa
200.00
December 28, 1978
Arriano Cesa
200.00
*113 Footnotes
1. Unless otherwise indicated all section references are to the Internal Revenue Code of 1954 as amended and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The additions to tax for fraud were not determined as to Assunta Cesa.↩
3. The 1978 taxable year of Cesa Cartage is not substantively before the Court because respondent never determined a deficiency for the 1978 taxable year. Respondent has made adjustments in 1978, however. Notably respondent had determined that $ 20,225.00 in deductions are disallowed and that Cesa Cartage is entitled to a new jobs credit of $ 8,354.00 and an investment tax credit of $ 1,070.00. Respondent's determinations have not resulted in any tax liability for Cesa Cartage in 1978, therefore we do not have jurisdication over the 1978 taxable year. Martz v. Commissioner,77 T.C. 749↩ (1981). The adjustments have, however, resulted in $ 164.00 new jobs credit carryback to the 1976 taxable year. We do have jurisdiction to look at the 1978 taxable year as its affects a carryback in a year currently before the Court. Sec. 6214(b).
4. At trial respondent moved to dismiss the case against Assunta Cesa under Rule 123. The parties informed the Court that a representative had not been appointed to represent the interests of the estate of Assunta Cesa. Since Mrs. Cesa's estate was minimal, petitioners did not object to the motion. We stated at trial that Mrs. Cesa would be dismissed. Respondent's motion is granted, but we will not enter a decision against Assunta Cesa in excess of the amount of the deficiency ultimately determined against her husband.↩
5. Cesa Cartage went out of business on April 17, 1987.↩
6. There are no cancelled checks in evidence for $ 1,759.10 which the Court included in Mr. Cesa's income. However, the cash disbursements journal indicates this amount was payable either to Mr. or Mrs. Cesa and was not chargeable to the payroll account. ↩
7. Respondent includes check number 1719, payable to "petty cash" in his calculation of total income from expense checks. There is no copy of check number 1719 in the record. Under the circumstances, we have insufficient evidence to conclude that this particular check was in fact endorsed and cashed by Mr. Cesa.↩
8. But see Truesdell v. Commissioner,89 T.C. 1280, 1298-1299↩ (1987).
9. The other adjustments respondent made include adjustments to the 1978 taxable year which resulted in a $ 164.00 carryback of an unused new jobs credit. For purposes of the 1976 carryback, we agree with respondent's adjustments made in 1978.↩
10. We note that $ 4,900 of the Cesa Cartage Company income has already been included in the calculation of Mr. Cesa's unreported income for 1976. See supraslip op. 20-23↩.
*. indicates that the amount was determined through the cash disbursement journal and that there is no cancelled check in evidence representing the amount.↩